

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAMES A. MARINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 04 C 2989 |
| | ) | |
| H.J. MOHR & SONS, CO. and | ) | Judge Ronald A. Guzmán |
| LOCAL NO. 786, INTERNATIONAL | ) | |
| BROTHERHOOD OF TEAMSTERS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James A. Marine has sued H.J. Mohr & Sons, Co. ("Mohr Co.") for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and for breach of the collective bargaining agreement ("CBA") under which the plaintiff was employed in violation of section 301(a) of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Marine has also sued Local No. 786, International Brotherhood of Teamsters ("the Union") for breach of the duty of fair representation under the LMRA. Before the Court are defendants' motions for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants the motions.

## FACTS

Unless otherwise noted, the following facts are undisputed or have been deemed admitted pursuant to Local Rule 56.1, which this Court strictly enforces. Steve Mohr, vice president of Mohr Co., hired James Marine as a full-time ready-mix driver in March 1995. (Def. Mohr's LR 56.1(a)(3) ¶¶ 10, 23.) As an employee of Mohr Co., Marine was a member of a bargaining unit

represented by the Union, which is affiliated with the International Brotherhood of Teamsters. (Def. Union's LR 56.1(a)(3) ¶ 1; Def. Mohr's LR 56.1(a)(3) ¶ 3.)

The terms and conditions of Marine's employment were governed by a CBA between Mohr Co. and the Union for the years of 2000 to 2004. (Def. Union's LR 56.1(a)(3) ¶ 1, Def. Mohr's LR 56.1(a)(3) ¶ 3.) The CBA provides procedures for filing grievances as well as provisions regarding seniority of employees and the maintenance of seniority. (Def. Union's LR 56.1(a)(3) ¶ 2.) The CBA also provides that "an employee's seniority shall be lost and terminated and the employment relationship terminated by discharge for just cause, resignation or failure to return to work upon recall after a layoff within seven working days after a recall notice by telegram or by certified mail." (*Id.* ¶ 4.)

The CBA's seniority provision divides employees into groups, the first group being chauffeurs, the second, quarry or pit chauffeurs and lastly, laborers and other employees not covered in the chauffeur groups. (*Id.*) The CBA further provides that an employee in one seniority group may not bump an employee within another group except in the case of permanent layoffs or in the case of certain exceptions in other seniority provisions, and an employer is not required to assign employees to perform work for which they are not qualified. (*Id.*)

The CBA's grievance procedure provides that an employee has the right to present grievances to his employer and have the grievances adjusted. (Def. Mohr's LR 56.1(a)(3) ¶ 18.) The grievance must be presented within seven days of the day the event that gives rise to the grievance occurs, and no party is required to consider any grievance that is not presented within that time period. (*Id.*) The grievance procedure further states that an employee who is no longer employed has no recourse under the CBA for complaints regarding wages or conditions of his

2

employment, except for grievances relating to his discharge. (*Id.* ¶ 19.) Although Marine nev saw a copy of the CBA that governed the terms and conditions of his employment with Mohr Co., Marine was aware that there was a grievance procedure he could utilize while employed by Mohr Co. (*Id.* ¶¶ 20, 21.) Marine has never filed a grievance. (*Id.* ¶ 22.)

Since the beginning of Marine's employment with Mohr Co. in 1995, Steve Mohr has known that Marine suffers from asthma. (*Id.* ¶ 25.) Marine has sought treatment for his asthma, and with treatment, he functions in a normally. (*Id.* ¶ 29.)

In the first year of his employment with Mohr Co., Marine told Steve Mohr on various occasions that his asthma was bad, to which Steve Mohr responded, "get your ass in here, we're busy today." (Pl.'s LR 56.1(b)(3)(B) ¶ 142.) Due to Steve Mohr's responses, Marine went into work despite his asthmatic condition. (*Id.*) Steve Mohr also accused Marine of wanting to stay home when he requested days off from work due to his asthma. (*Id.* ¶ 143.)

In 1996, Marine resigned from Mohr Co. because Mohr Co. denied his request to drive an air conditioned truck in 1995 and because Steve Mohr falsely accused him of breaking his truck, but Steve Mohr reinstated him a few weeks later after he requested his job back. (*Id.* ¶ 144.) At various times after Marine's reinstatement, when he requested time off from work, Steve Mohr stated that he needed Marine at work and that Mohr Co. was busy. (*Id.* ¶ 145.)

In the late 1990s, after informing Steve Mohr he was leaving, Marine left work due to an asthma attack and went to the hospital for breathing treatments. (Def. Mohr's LR 56.1(a)(3) ¶¶ 62-63.) The next day, Steve Mohr accused Marine of vomiting in the bathroom the day before, which Marine denied, to which Steve Mohr responded, "Don't start. Go clean it up or go find a new f----ing job." (*Id.* ¶ 65.)

In May 2001, Marine suffered an asthma attack at work and informed Steve Mohr he

needed to go to the hospital. (*Id.* ¶¶ 48-49.) Marine reported for work the next day. (*Id.* ¶ 51.)

From September 19 to September 22, 2001, Marine was hospitalized due to an asthma attack. (*Id.* ¶ 52.) He believes that someone from Mohr Co. called the hospital to verify that Marine was being treated. (*Id.* ¶ 54.) Marine attended a follow-up doctor's appointment on September 27, 2001, and when Marine asked to leave early, Steve Mohr responded, "I can't promise anything. I'll see what I can do." (*Id.* ¶ 45.) Marine was granted time off for follow-up visits on October 11, 2001, November 1, 2001 and June 3, 2002. (*Id.* ¶ 46.) In 2002, Marine stopped requesting time off for doctor visits and instead furnished Celeste Mohr, Steve Mohr's wife and an employee of Mohr Co., with doctor's notes subsequent to the appointments as confirmation that he was at the doctor's office. (*Id.* ¶ 43.) Marine took time off to visit his doctor on July 8, 2002, September 16, 2002, September 23, 2002, October 28, 2002, January 21, 2003 and August 22, 2003. (*Id.* ¶ 47.) Marine was never disciplined regarding his absences from work to attend doctor appointments. (*Id.* ¶ 44.)

In December 2003, Mohr Co. closed down for two weeks over Christmas, during which time Marine took vacation. (*Id.* ¶ 76.) In January 2004, Marine requested vacation pay for the vacation he had taken in December 2003 and was told by Celeste Mohr that Mohr Co. "did not have it." (*Id.* ¶ 66.) When Marine reported to work after his vacation, Steve Mohr told Marine he should have called in because there was not much work, but he allowed Marine to help out in the yard. (*Id.* ¶ 77.) Marine was laid off by Steve Mohr in mid-January. (*Id.* ¶ 79.) Marine had been laid off in prior years and believed that his January 2004 lay off was seasonal and would last a month or two. (*Id.* ¶ 80.) During Marine's lay off, Mohr Co. retained Steve Mohr's daughter's boyfriend, Phil Manno, who was training to be a driver, to perform construction and maintenance and to help Mohr Co. become OSHA and EPA compliant. (Pl.'s LR 56.1(b)(3)(B)

¶ 160.) Manno was paid at the semi ready-mix truck driver rate for his work. (*Id.* ¶ 164.)[1] In previous years at Mohr Co., Marine had worked during the winters performing various other duties including driving other types of trucks, working in the yard, shoveling snow and working in the warehouse. (Def. Union's LR 56.1(a)(3) ¶ 32.) In early February, Marine received a call from an employee at Mohr, who stated that Manno was working steadily for Mohr during the winter and nobody was complaining to the Union about it. (Def. Mohr's LR 56.1(a)(3) ¶ 93.) As a result, Marine called Mohr Co. and asked Marlene Mohr, Steve Mohr's daughter who answered phones, if he could work a full week. (*Id.*) Marlene told him he could not. (*Id.*)

In February, Marine found employment as a driver for T & M Express, which leases trucks to a company named Klem. (*Id.* ¶¶ 82-83.) On February 24, 2004, Marine received a phone call from Marlene Mohr, who informed Marine that her father wanted to speak with him. (*Id.* ¶ 99.) Steve Mohr and Marine had a phone conversation regarding rumors that were being spread about Thomas Walsh, deceased, a former driver for Mohr Co. who was Steve Mohr's nephew. (*Id.* ¶ 101.) Steve Mohr stated that his niece Tracy was told by another driver that Mohr called Thomas Walsh a drug addict and a drunk. (Pl.'s LR 56.1(b)(3)(B) ¶ 169.) Steve Mohr told Marine that he did not need Tracy starting trouble or Marine going behind his back and squealing. (Def. Mohr's LR 56.1(a)(3) ¶ 102.) Marine told Steve Mohr that he did not say anything, to which Mohr responded, "Well, I don't want you here no more and I'm not bringing you back and you better stay working for Klem." (*Id.* ¶ 103.)

On February 25, 2004, Marine went to Mohr Co. to determine if in fact he was

---

[1]Although Marine also states that Manno had the least seniority of all of the drivers who worked for Mohr Co. during that time period, *see* Pl.'s LR 56.1(b)(3)(B) ¶ 164, the citations to the record that Marine provides do not support this fact statement and do not support the inference that Manno was a Group 1 chauffeur.

terminated. (*Id.* ¶ 105.) Steve Mohr and Marine had the same conversation that they had had the previous day over the phone. (Pl.'s LR 56.1(b)(3)(B) ¶ 170.) Marine denied spreading rumors, to which Steve Mohr responded, "Well, I can deal with Kevin [Richards, Steve's brother-in-law] squealing behind my back, but I can't deal with you squealing behind my back, so I'm getting rid of you." (Def. Mohr's LR 56.1(a)(3) ¶ 108.) At the time, Marine believed the rumor was the reason Steve Mohr was terminating him. (Pl.'s LR 56.1(b)(3)(B) ¶ 172.)

That same day, Marine contacted Bill Guth, a business representative for the Union, regarding his termination, and Guth went to Mohr Co. to speak with Steve Mohr. (Def. Mohr's LR 56.1(a)(3) ¶¶ 112-14.) Later in the day, Guth called Marine and told him he had spoke with Steve Mohr. (*Id.* ¶ 117.) During their conversation, Guth told Marine, "Steve never said that, no, those things to you. He just said he doesn't have 40 hours of work for you." (*Id.* ¶ 118.) Marine protested, stating that the reason he had called Guth was because Mohr had fired him. (*Id.*) Guth replied Marine still had his seniority and that Marine would be going back to work soon at Mohr Co. (*Id.* ¶ 121.) According to plaintiff, Marine also informed Guth that Steve Mohr had Phil Manno working in maintenance. (Pl.'s LR 56.1(b)(3)(B) ¶ 163.) Guth replied that there was no reason to file a grievance at the time and that Marine could hire a private attorney. (Def. Mohr's LR 56.1(a)(3) ¶ 118.)

On March 26, 2004, Marine filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights alleging that his supervisor verbally harassed him and treated him disrespectfully because of Marine's actual or perceived disability, asthma. (Compl. Attach.) Marine also alleged that similarly situated employees who did not suffer from asthma and who were not perceived to have a disability, and with less seniority, were not terminated. (*Id.*) On April 9, 2004, Marine received a right-to-sue letter from the EEOC. (Compl. ¶ 7.)

Apparently, Marine was mistaken about his termination because on April 5, 6, 7, 8 and 9 of 2004, warning notices were sent to Marine's attorney and Bill Guth for failure to call into work for starting time. (Pl.'s LR 56.1(b)(3)(B) ¶ 184.) All of the warning notices stated that the third notice within a twelve-month period will result in immediate dismissal. (*Id.* ¶¶ 186-88.) On April 12, 2004, Guth sent Marine a letter that notified him that Guth had received warning notices from Mohr Co. regarding Marine's failure to appear at work and further stated that if Marine wished to protect his seniority, he must return to work or request a leave of absence. (Def. Mohr's LR 56.1(a)(3) ¶ 128.) The letter also stated that if Marine wished to grieve the notices, to contact Guth, and enclosed with the letter was a blank grievance form. (*Id.*) After receiving the April 12, 2004 letter, Marine did not complete a grievance form or contact Guth. (Pl.'s LR 56.1(b)(3)(A) ¶ 129.) Marine filed the instant complaint on April 27, 2004.

## DISCUSSION

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). Further, all reasonable factual inferences must be viewed in favor of the non-moving party. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

# I. ADA

First, defendant Mohr Co. argues that plaintiff is barred from basing his ADA disparate treatment claim on events that occurred outside of the 300-day period prior to the filing of his EEOC charge on March 26, 2004. In response, plaintiff apparently concedes as much, but he argues that he may rely on such events as evidence to prove the timely claim based on his termination. (Pl.'s Consol. Mem. Opp'n Defs.' Mots. Summ. J. ("Pl.'s Mem.") at 10 n.3.) "[I]t is well settled that evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer." *Mathewson v. Nat'l Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986). Thus, the Court considers events that fall outside of the 300-day limitations period as evidence to support plaintiff's disparate treatment claim based on timely events.

However, Marine also sues Mohr Co. under a hostile work environment theory pursuant to the ADA. "Although [the Seventh Circuit] ha[s] not yet decided whether a claim for hostile work environment is cognizable under the ADA[,] . . . [it] assume[s] the existence of such claims where resolution of the issue has not been necessary." *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). Because the Court in this case finds that resolution of the issue is not necessary, it assumes that a claim for hostile work environment is cognizable under the ADA. Further, because a plaintiff suing under a hostile work environment theory may recover for related acts occurring more than 300 days before an EEOC charge was filed, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002), this Court also assumes that the same would hold true for such claims brought pursuant to the ADA. *Cf. Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003) (applying *Morgan* to claim brought pursuant to 42 U.S.C. § 1983). Accordingly, the Court, for purposes of Marine's ADA hostile work environment claim,

8

considers all of the events of which Marine complains.[2] Even when considering all of the events, however, for reasons discussed below, Marine's hostile work environment claim cannot withstand defendants' summary judgment motions.

Second, Mohr Co. argues that Marine has failed to establish a genuine issue of material fact as to his ADA disparate treatment claim. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In order to prove discrimination under the ADA, the plaintiff must establish that: (1) he is disabled within the meaning of the ADA, (2) his performance met his employer's legitimate expectations, (3) he was discharged, and (4) the circumstances surrounding his termination show it is more likely than not that his disability was the reason for the termination. *Patterson v. Chi. Ass'n for Retarded Citizens*, 150 F.3d 719, 725 (7th Cir. 1998) (quotations omitted). Once the

---

[2]For purposes of the instant motion, the Court considers all of the events related to the alleged hostile work environment despite the facts that (1) Marine resigned one year after he was hired due to Mohr Co.'s denial of his request for an air conditioned truck (that he requested because his asthma causes severe persistent sweating in high temperatures) and because Steve Mohr accused Marine of breaking his truck and (2) Marine was reinstated after he requested to return to work. The Court need not address whether Marine's resignation in 1996 signifies that he was aware of the alleged hostile work environment at that time and whether the continuing violation doctrine applies in such a case because even if the Court were to consider all of the events, Marine has still failed to create a triable issue as to this claim.

plaintiff establishes all elements of a *prima facie* case of discrimination, the burden of production then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995); *Nawrot v. CPC Int'l*, 277 F.3d 896, 905-06 (7th Cir. 2002). Once a reason is proffered, the burden of production shifts back to the plaintiff to prove that the employer's proffered reason is pretextual. *Nawrot*, 277 F.3d at 905. At all times, the burden of persuasion remains with the plaintiff. *Id.* at 906.

A threshold requirement for an ADA claim is that the plaintiff "must first establish that she has a disability as defined by the ADA." *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 571-72 (7th Cir. 2001). The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995). Marine argues that he falls within the first and third categories.

## A. Physical Impairment that Substantially Limits One or More of the Major Life Activities

The Court must first determine whether Marine's asthma is a physical impairment which substantially limits one or more major life activities. Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). That term "refers to those activities that are of central importance to daily life." *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002). The term "substantially limits" means: (1) "[u]nable to perform a major life activity that the average person in the general population can perform"; (2) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life

10

activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"; or (3) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment". 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii).

To determine whether an impairment substantially limits a major life activity, the court must take into consideration the effects of any corrective measures that the person is taking to control or mitigate the impairment, including medication. *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). Further, the court considers evidence of the nature and severity of the impairment, its duration, and whether it will have a permanent or long-term impact. 29 C.F.R. § 1630.2(j)(1).

While asthma is an impairment that affects one's breathing, the pivotal issue is whether Marine's asthma "substantially limits" his ability to breathe. The record reveals that Marine suffered asthma attacks during his employment at Mohr Co., at least two of which required hospital visits. (Def. Mohr's LR 56.1(a)(3) ¶¶ 48, 52.) However, Marine testified that with treatment, he functions in a normal day-to-day manner despite his condition. (*Id.* ¶ 29.) Although Marine stated that his medication does not cure all the effects of his asthma, such as profuse sweating in high temperatures and the inability to run more that half of a mile without having shortness of breath or an asthma attack, he admits that his medication helps him to function fully. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 136-37.) Being limited in running half of a mile and profusely sweating in high temperatures do not severely restrict Marine from activities that are of central importance to most people's daily lives. The Court holds that Marine's treated asthma does not "substantially limit" any major life activity. Marine's medication assists him in fully functioning, and he does not fall within the first definition of "disabled" under the ADA.

11

## B. Being Regarded as Having a Disability

Marine also argues that Mohr Co. regarded him as disabled because of his asthma. An ADA plaintiff may establish that his employer regarded him as having a disability if either: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489; *see* 29 C.F.R. § 1630.2(*l*). "It is important to note that, in order to establish a 'regarded as' claim, it is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001). An employer regards an employee's condition as "substantially limiting" if he perceives the employee to be "significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Riemer v. Ill. Dep't of Transp.*, 148 F.3d 800, 806 (7th Cir. 1998).

Marine contends that Steve Mohr's comments regarding his taking time off for asthma treatments, accusing him of not wanting to work, forcing Marine to clean up vomit and terminating Marine are all actions that create a genuine issue of fact as to whether Mohr Co. perceived Marine as being substantially limited in his ability to breathe. (*Id.* at 5.) The Court disagrees.

In *Riemer v. Illinois Department of Transportation*, an employer transferred an asthmatic employee to a less favorable, lower paying outdoor position to prevent a reoccurrence of the employee's asthma attacks caused by fumes from the shop in which he worked although the employee's doctor declared the asthma 100% controlled. 148 F.3d at 802-03. The *Reimer*

12

court found that evidence of the plaintiff's transfer was sufficient to find that the employer perceived him to be substantially limited in the area of breathing. *Id.* at 807.

The Court finds *Riemer* distinguishable from the case at hand. Here, Mohr Co. had knowledge of Marine's asthma, but that is not enough. *See Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998) ("It is not enough for Skorup to show that Modern Door was aware of her impairment; instead Skorup must show that Modern Door knew of the impairment and believed that she was substantially limited because of it."). In contrast to *Riemer*, there is no evidence from which to reasonably infer that the actions of Mohr Co. were even remotely based on a perception that Marine was substantially limited in his ability to breathe.

Marine also cites *Mannie v. Potter*, a case in which the court ruled that evidence that supervisors treated other employees differently and constantly referred to plaintiff (who suffered from paranoid schizophrenia) as "crazy" and stated she could not be relied upon to operate certain machinery because such work required "live bodies" was sufficient to create a triable issue as to whether the employer regarded plaintiff as having a disability that substantially limited her ability to carry out the major life function of working. No. 01 C 9097, 2003 WL 21799963, at *9 (N.D. Ill. Aug. 4, 2003), *aff'd*, 394 F.3d 977 (7th Cir. 2005). Unlike in *Mannie*, where the evidence showed the employer perceived that the plaintiff was unable to work any job requiring a "live body," nothing in the record suggests that Mohr Co. held misperceptions that Marine's ability to breathe was substantially limited. Making an employee clean up vomit, questioning the necessity of the employee's taking days off for doctor's appointments, and telling an employee that he is needed at work do not reflect any misperception about the employee's ability to breathe.

When viewing all of the disputed facts in Marine's favor and considering the undisputed

13

facts, Marine fails to raise a triable issue as to whether Mohr Co. regarded him as having asthma that substantially limited his ability to breathe. First, to support his claim, Marine relies on Steve Mohr's negative attitude regarding the plaintiff's doctor appointments and absence from work and Mohr's requiring plaintiff to come into work regardless of the plaintiff's asthma attacks. (Pl.'s LR 56.1(b)(3)(B) ¶ 142.) However, no reasonable jury could conclude from Mohr's requiring Marine to be at work during his shift that Mohr perceived Marine to be substantially limited in his ability to breathe. Further, there was not a consistent negative attitude regarding the him leaving work for doctor's appointments, as Marine admits that he was granted time off to visit the doctor at various times in 2001 and 2002 and that when Marine took time off to visit the doctor without permission, he was not disciplined or approached regarding his absences. (Def. Mohr's LR 56.1(a)(3) ¶¶ 44-48.) In addition, a rational jury cannot reasonably infer from Mohr Co.'s knowledge of Marine's medical appointments that the Mohr Co. perceived him to have a disability. *See Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999) (stating that an employer's awareness of medical appointments does not create an inference that the employer assumed the employee had a disability).

A negative attitude, insensitive comments and hostility toward an employee by an employer, even when the insensitivity and hostility show that the employer was aware of the plaintiff's condition, are insufficient to support an inference that the employer believed the employee was substantially limited in any major life activity. *Blakely v. Brach & Brock Confections*, 181 F. Supp. 2d 943, 950 (N.D. Ill. 2002) (finding that insensitive comments about an employee's Graves disease was insufficient to show that the employer regarded the employee as substantially impaired in a major life activity). The undisputed evidence before the Court merely shows that Steve Mohr was perhaps insensitive to Marine, not that Mohr Co. treated

Marine in a manner that indicated that it perceived him to be substantially limited in the major life activity of breathing.

The record before the Court shows that Mohr Co. did not view Marine's asthma as a limitation at all. Even when Marine's asthma was more severe and he requested time off, Steve Mohr responded, "Get your ass in here, we're busy today." (Pl.'s LR 56.1(b)(3)(B) ¶ 142.) Mohr testified that he used the same language when all employees called in requesting to take the day off. (Def. Mohr's Ex. B, Mohr Dep. at 90.) Mohr's treatment of Marine's asthmatic condition demonstrates that he expected Marine to work as any other worker without asthma would. *Davis v. Am. Drug Stores*, No. 01 C 3407, 2003 WL 21149063, at *6 (N.D. Ill. May 19, 2003). Further, that Marine was asked to provide his doctor's phone number after Marine missed a delivery and Mohr became upset (Pl.'s LR 56.1(b)(3)(B) ¶ 141), and that Marine states that someone from Mohr Co. called the hospital to verify that plaintiff was hospitalized for asthma (Def. Mohr's LR 56.1(a)(3) ¶¶ 53-54), shows that Mohr Co. did not believe that Marine was limited at all, and certainly does not support a reasonable inference that Mohr Co. believed Marine's asthma was substantially limiting. In sum, the record before the Court fails to raise a genuine issue of material fact regarding whether Mohr Co. perceived Marine as having a disability that substantially limits his ability to breathe. Accordingly, the Court grants Mohr Co.'s summary judgment motion as to Marine's ADA disparate treatment claim.

## C. Hostile Work Environment

Marine has also alleged in his complaint that he was unlawfully harassed because of his perceived disability. As discussed above, this circuit has not expressly recognized a cause of action for an ADA claim based on hostile work environment or harassment. *Silk v. City of Chi.*,

194 F.3d 788, 803 (7th Cir. 1999). Assuming without ruling that this cause of action exists under the ADA, Marine would have to proceed under the standards established for hostile work environment claims under Title VII. *See Mannie*, 394 F.3d at 982. In order to prove a hostile environment claim, a plaintiff must show the work environment was both objectively and subjectively hostile. *Silk*, 194 F.3d at 804. An objectively hostile work environment is one that a reasonable person would find abusive or hostile. *Id.* When an employee experiences harassment that is so severe and pervasive that the harassment alters the conditions of employment and creates an abusive environment, a hostile work environment exists. *Id.* The courts look to the frequency of the discriminatory conduct, severity, threatening or humiliating nature of the conduct, and whether it unreasonably interferes with the employee's work performance in order to determine whether the plaintiff meets the hostile work environment standard. *Mannie*, 394 F.3d at 982.

Marine has not raised a triable issue with regard to the purported hostile work environment because the events about which he complains were not sufficiently severe or pervasive such that a reasonable person would believe them to be abusive or hostile. The Court addresses each complaint in turn.

First, Marine argues that Mohr Co.'s denial of his request for an air conditioned truck in 1995 contributed to a hostile work environment. However, it is undisputed that when Marine made this request to Steve Mohr, Marine did not explain why he was requesting an air conditioned truck. (Def. Mohr's LR 56.1(a)(3) ¶ 36.) It is also undisputed that in winter 2003, it was mentioned to Marine that he was going to get an air conditioned truck, but Marine did not want the truck because he improperly believed that accepting the air conditioned truck would cause conflicts with others because the air conditioned truck at issue was still assigned to Kevin

Richards, Steve Mohr's brother-in-law, who had more seniority than Marine. (Pl.'s LR 56.1(b)(3)(A) ¶ 37.)

Second, Marine states that in the mid-to-late 1990s, Steve Mohr made him clean up vomit in the bathroom on the day after Marine had left work due to an asthma attack. Although Marine denied Mohr's accusations that Marine had made the mess, Mohr stated "Don't start. Go clean it up or go find a new f----ing job." (*Id.* ¶¶ 63-65.) Although a reasonable jury could find that Steve Mohr's conduct was both threatening and humiliating with regard to this particular incident, this isolated incident, when considered with all of the other incidents, was not sufficiently pervasive or frequent during the course of Marine's nine-year tenure with Mohr Co. to constitute a hostile work environment.

Third, Marine argues that Steve Mohr harassed him by not allowing him time off when his asthma was severe or time off for doctor's appointments, and when requested, Mohr would respond by saying, "get your ass in here, we are busy today, I don't care." (Pl.'s LR 56.1(b)(3)(B) ¶¶ 142, 145.) The record shows that Mohr said this to all employees who called in and asked for the day off. (Def. Mohr's Ex. B, Mohr Dep. at 90.) Although Marine alleges that Mohr's refusal of Marine's requests for time off for doctor's appointments and for times when his asthma was more severe, Mohr's treatment was not sufficiently severe and was inconsistent over time. Steve Mohr permitted Marine time off for doctor's appointments on October 11, 2001, November 1, 2001, June 3, 2002, July 8, 2002, September 16 and 23, 2002, October 28, 2002, January 21, 2003 and August 22, 2003. (*Id.* ¶¶ 45-47.) With regard to those times when Marine went to the doctor without telling anyone at Mohr Co., it is undisputed that there were never any repercussions as a result of his doing so. (*Id.* ¶ 44.) Marine has failed to present any evidence that the alleged harassment affected his work performance in any way, and nothing in

17

the record indicates that Marine's work performance suffered as a result of Mohr Co.'s treatment of him.

Fourth, Marine cites the denial of vacation pay in January 2004 as contributing to a hostile work environment. (Def. Mohr's LR 56.1(a)(3) ¶¶ 35, 65-66; Pl.'s LR 56.1(b)(3)(B) ¶¶ 154, 156.) There is no evidence in the record that the denial of vacation pay was related to Marine's asthma. Further, there is ample evidence that Mohr Co. did not single out Marine for the denial of vacation pay. It is undisputed that John Lenzey, a Mohr Co. truck driver, and Delmare Allen, another Mohr Co. employee, also requested and were denied vacation pay. (Def. Mohr's LR 56.1(a)(3) ¶¶ 69-71.) It is undisputed that Lenzey and Allen did not suffer from any form of asthma, and it is unknown whether they suffer from any form of disability. (Def. Union's LR 56.1(a)(3) ¶ 48.)

In sum, even if the Court were to assume Marine could sue Mohr Co. for a hostile work environment under the ADA, Marine has failed to raise a triable issue of fact regarding whether the alleged harassment was based on his asthma and objectively severe and pervasive. The Court grants Mohr Co.'s motion for summary judgment as to Marine's ADA hostile work environment claim.

## II.    Breach of Duty of Fair Representation and Violation of the CBA

Marine has also sued Mohr Co. for violating the CBA by discriminating against him because of his disability and the Union for breaching its duty of fair representation by failing to process a grievance challenging Marine's termination. Defendants argue that Marine: (1) failed to exhaust his remedies under the CBA and (2) fails to raise a triable issue as to whether Mohr Co. breached the CBA and the Union breached its duty of fair representation when it refused to

grieve his termination.

## A. Exhaustion

Generally, an employee suing for breach of a CBA must first attempt to exhaust his contractual remedies under that agreement before filing suit against his union or employer under section 301(a) of the LMRA. *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 610 (7th Cir. 2001). However, the exhaustion requirement may be excused if an employee's "resorting to the grievance procedure would be futile" or if "the union breached its duty of fair representation." *See id.* at 615. To establish futility, "[i]t is well-settled . . . that a plaintiff must show that union hostility is so pervasive that it infects every step of the internal appeals process." *Hammer v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 178 F.3d 856, 858 (7th Cir. 1999). Mere assertion or speculation that a union member's adhering to the grievance procedure would be futile does not excuse his or her failure to exhaust. *Douglas v. Am. Info. Techs. Corp.*, 877 F.2d 565, 574 (7th Cir. 1989).

The CBA at issue provides a four-step grievance procedure. (Def. Mohr's LR 56.1(a)(3) ¶ 17.) The first step, which apparently was the only step taken in this case, provides that "[a]n effort shall be made to adjust the grievance by and between the employee having the grievance and his immediate supervisor. If he so desires, the employee may also have his Union representative present and the grievance maybe presented by the Union representative." (*See* Def. Union's Ex. A, CBA ¶ 18.3-1.)

On February 25, 2004, Marine spoke to Bill Guth, a business representative for the Union, and told Guth that he had been terminated. (Def. Mohr's LR 56.1(a)(3) ¶ 112.) Marine wanted to know why he was terminated and Guth told him that he would go to Mohr Co. to

need to file a grievance and that he hire a private attorney. (Pl.'s LR 56.1(b)(3)(A) ¶ 128.)

Viewing all facts and drawing all reasonable inferences in Marine's favor, especially in light of Guth's suggestion that Marine hire a private attorney, the Court holds that Marine had put the grievance procedure to the test, and Guth indicated that the Union would not proceed with a grievance (the second step) had Marine pressed the issue of his purported termination for spreading rumors and seniority rights regarding Phil Manno. Further, because Marine's LMRA claims ultimately fail on the merits, the Court assumes without ruling that the taint from the February 25 incident explains and excuses Marine's failure to file a grievance as to the April 12 termination.

## B. Merits

This is a hybrid action under section 301 of the LMRA because Marine has sued his employer for violation of the CBA and the union for breaching its duty of fair representation. *See, e.g., McLeod*, 258 F.3d at 613. The individual claims against the employer and the union in a hybrid action are interlocking, and neither claim is viable if the other fails. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997). Where an employee complains that a union breached its duty of fair representation in refusing to process a grievance, "the court must look at least to the arguable merits of the grievance, which necessarily involves looking at the contract. Where the court is well able to decide that the employee's contractual claim lacks merit as a matter of law, it is appropriate for the court to decide the case on that issue." *Id.* at 1241-42. That is, to determine whether a grievance is meritorious, the provisions of the CBA must be examined. *Id.*

## A. Whether Defendant Mohr Breached the CBA

### 1. Termination in Violation of CBA's Prohibition Against Disability Discrimination

Marine contends that Mohr Co. violated the CBA governing his employment by discriminating against him based on his disability in violation of the ADA and thus, in essence, terminating him without cause. Indeed, the CBA between the Union and Mohr Co. prohibits many types of discrimination, including discrimination based on disability. (Pl.'s LR 56.1(b)(3)(B) ¶ 135.) However, as discussed above, Marine has not established a genuine issue as to the material facts as to whether he is "disabled" under the ADA and whether he was subjected to a hostile work environment at Mohr Co. Further, the undisputed facts show that Mohr Co. terminated Marine for failure to call into work in April 2004 even after he had been given five warning notices regarding five consecutive starting dates. Accordingly, the Court also grants Mohr Co.'s motion for summary judgment as to Marine's claim of breach of the CBA based on disability discrimination and his termination.

### 2. Violation of the CBA's Seniority Provisions

Although not presented in his complaint, Marine argues in his memorandum that Mohr Co. violated the CBA's seniority provisions when it employed Phil Manno as a maintenance laborer during the winter months of 2003-04 while Marine was laid off. The CBA outlines the seniority rules and provides that "[n]othing contained in this Article shall require an Employer to assign employees to operate equipment or perform work for which they are not qualified." (Def. Union's Ex. 1, CBA, ¶ 12.7 at 000152.) With regard to this provision, Marine does not present sufficient evidence to create a triable factual issue regarding whether the CBA's seniority provisions were violated.

investigate. (*Id.* ¶ 113.) Guth drove to Mohr Co. later that morning and spoke to Steve Mohr. (*Id.* ¶ 114.) Guth asked Mohr if he had fired Marine, and Mohr denied it. (*Id.* ¶ 115.)[3] Guth then called Marine and told him that he went to Mohr Co.'s office and spoke to Steve Mohr. (*Id.* ¶ 117.) According to Marine, his conversation with Guth was as follows:

> He said, "Steve never said that, no, those things to you. He just said he doesn't have 40 hours a week for you."
> I said, "Bill, that's not the reason I called you. The reason I called you, he fired me."
>
> He goes, "well he didn't say those things and you still got your seniority. You'll be going back to work soon, he just doesn't have 40 hours a week for you."
>
> And I told him, I said, "Well, he has Phil working. Karen Richards told me Phil Mano [sic] is working."
>
> * * *
>
> He said, "Well, there's no reason for you to file a grievance at this time."
>
> I said, "Bill, you don't understand what happened."
>
> He goes, "Well, why don't you go ahead and hire a private attorney."

(Def. Mohr's Ex. A, Marine Dep. at 115-16.)

Further, Marine failed to file a grievance with regard to his termination after he was notified by Guth on April 12, 2004 about the five warning notices for Marine's failure to call into work for the starting times of April 5-9, 2004. (Def. Mohr's LR 56.1(a)(3) ¶ 128.) Marine argues that he did not file a grievance at that time because he found Guth's April 12, 2004 letter to be "[a] little late" and because of Guth's previous comments suggesting that there was no

---

[3]Although Marine attempts to dispute this fact statement with his own deposition testimony, clearly Marine has no personal knowledge of, and therefore cannot attest to, the conversation between Guth and Steve Mohr. (*See* Pl.'s LR 56.1(b)(3)(A) ¶ 115.)

During the winter of 2003-04, when Marine was subject to a temporary lay off and Manno was not, Manno helped Mohr Co. comply with Occupational Safety and Health Administration ("OSHA") and Environmental Protection Agency ("EPA") regulations in relation to underground gas storage tanks. (Def. Mohr's LR 56.1(a)(3) ¶ 91.) According to Steve Mohr, Manno was brought in because he knew about underground storage tanks and how to complete the requisite paperwork relating to the tanks. (Def. Mohr's Ex. B, Mohr Dep. at 82.) Mohr stated that "Jimmie [Marine] was not capable of, you know, having the credentials or knowledge to do what Phil did as far as dealing with the stuff at that end of the yard. Setting up, I am talking about forms, the heights and drainage, and using a transit, and all that other stuff that he did to down there." (*Id.* at 89.) He further stated, "I don't know all of the OSHA rules. [Manno] did." (*Id.* at 79.)

Although Marine attempts to dispute the work that Manno performed during that time with the testimony of Delmare Allen, John Lenzey, Cyrene Kellogg, and Thomas Callahan, their testimony does not raise a triable issue of fact. Allen testified, "I really don't know what he was hired for." (Pl.'s Ex. C, Allen Dep. at 24.) Lenzey testified that he did not know whether Manno drove a truck during that time period and that during that winter, Manno worked in the back of the yard on a project, which included erecting a wall by the sand pile, "[b]ut that is as far as I know." (Pl.'s Ex. D, Lenzey Dep. at 21.) When asked what work Manno had performed during that time, Kellogg stated, "As far as I know, a little bit of construction stuff, straightening up stuff." (Pl.'s Ex. F, Kellogg Dep. at 12.) Callahan testified that when he returned from the lay off, he saw Manno working in the yard, doing construction work, and pouring walls. (Pl.'s Ex. G, Callahan Dep. at 17.) None of this testimony contradicts Mohr Co.'s statement of fact regarding the OSHA and EPA aspects of the work Manno had performed. Further, none of this

testimony established that Marine was qualified to perform such OSHA and EPA compliance work. In addition, the work performed by Manno was different than the laborer work performed by Marine in the previous winters. (Pl.'s LR 56.1(b)(3)(B) ¶¶ 160, 166; Def. Mohr's LR 56.1(a)(3) ¶ 91; Def. Mohr's Ex. B, Mohr Dep. at 79.) Further, Marine has failed to establish that Manno was categorized as a chauffeur (Group 1) and has merely established that Manno was training for, but had not yet attained, Group 1 status, and accordingly, the Court lacks information necessary to ascertain Marine's bumping rights. Thus, there is insufficient evidence presented to create a dispute as to whether Mohr Co. violated the CBA in employing Manno over the winter months in 2003-04.

## B.     Whether the Union Breached Its Duty of Fair Representation

Even if Marine were able to establish that Mohr had breached the CBA provisions, his LMRA claims would still fail. To establish a breach of duty of fair representation, the employee must establish that its underlying grievance was meritorious and that the union's actions in processing or refusing to process the grievance are arbitrary, discriminatory or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 194 (1967). "'Arbitrary,' 'discriminatory,' and 'bad faith' are three separate parts of the fair representation test, and each must be analyzed individually." *Crider*, 130 F.3d at 1243. "In order to prevail in a fair representation suit in this Circuit, a plaintiff must prove that the union committed intentional misconduct." *Bassett v. Local Union No. 705, Int'l B'hd of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 908 F.2d 218, 220 n.1 (7th Cir. 1990).

Marine does not argue that the Union's refusal to process his grievance was discriminatory; however, he argues that the Union acted arbitrarily and in bad faith. The Court

24

addresses each in turn.

### 1. Whether Union Acted Arbitrarily in Refusing to Grieve Marine's Termination

Marine contends that the Union, through its representative Guth, acted irrationally and arbitrarily in completely disregarding his desire to grieve his termination. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 6.) A union's actions are considered arbitrary if they are so outside a wide realm of reasonableness as to be irrational. *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). The standard for arbitrary action is a deferential one, one that does not allow the court to substitute its judgment for the decision of the union, even if the union could have handled the problem better in retrospect. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992).

Marine contacted Guth on February 25, 2004, regarding the conversation Marine and Steve Mohr had that Marine believed resulted in his termination. (Def. Mohr's LR 56.1(a)(3) ¶ 112.) Because of Marine's concerns that he had been terminated, Guth went to investigate. (Def. Mohr's LR 56.1(a)(3) ¶¶ 113-14.) It is undisputed that Mohr told Guth that Marine was not terminated. (Def. Mohr's LR 56.1(a)(3) ¶ 115, Def. Union's LR 56.1(a)(3) ¶¶ 42-43.) After speaking with Mohr, Guth told Marine that he still had his seniority and that Mohr just said he temporarily did not have forty hours of work a week for him. (Pl.'s LR 56.1(b)(3)(B) ¶ 39.) Guth's statements implied that Marine remained an employee of Mohr Co. with his seniority intact. (*See id.*) Guth's actions in attempting to resolve the dispute between Mohr and Marine show that Guth did not act irrationally; he contacted Steve Mohr immediately regarding his conversations with Marine. (Def. Union's LR 56.1(a)(3) ¶¶ 42-43.)

Moreover, Guth, having clarified that Marine had not been terminated on February 25,

2004, would not have believed there was any reason to file a grievance. Guth satisfied his duty to perform a minimal investigation into the circumstances surrounding Marine's apparent termination, and his investigation clarified that Marine had not been terminated. Thus, he did not act irrationally with respect to the termination.

As for any alleged violation of the CBA's seniority rules, the Union did not breach its duty of fair representation. Mere errors of judgment are insufficient to establish a breach of duty. *Rupe v. Spector Freight Sys., Inc*, 679 F.2d 685, 692 (7th Cir. 1982). While a union has a duty to represent union members fairly, it only breaches the duty if it deliberately and unjustifiably refuses to represent a union member. *Burman v. TransWorld Airlines*, 570 F. Supp 1303, 1309 (N.D. Ill. 1983). Even gross negligence is insufficient to evidence a breach of duty, because intentional conduct may not be inferred from negligence. *Id.*

Nothing in the record indicates that Guth's conduct with regard to any purported breach of seniority rules was an intentional refusal to process a grievance. Guth had seen all of the drivers working for Mohr Co. during the winter and believed that all of them had more seniority than Marine. (*Id.* ¶ 33.) Guth did not unjustifiably and deliberately refuse to represent Marine with regard to the CBA's seniority rules. At most, Guth's conduct constituted negligence.

In *Rupe v. Spector Freight Systems, Inc.*, the plaintiff was terminated and asked that his union representative file a grievance. 679 F.2d 685, 689 (7th Cir. 1982). Although the union representative refused to grieve plaintiff's termination because the representative believed that the CBA allowed the employer to discharge casual employees such as the plaintiff without cause, the *Rupe* court held that the representative's mere error of judgment was insufficient to establish a breach of duty of fair representation. *Id.*

The same can be said about Guth's conduct. While it arguably might have been

erroneous not to file a grievance on Marine's behalf, Guth believed that there was no seniority or termination issues that needed to be grieved. Although Guth could have been a more effective advocate, his conduct was reasonable given the circumstances. Accordingly the Court holds that Marine has failed to raise a genuine issue as to whether the Union acted arbitrarily in refusing to grieve his complaints.

## 2. Whether Union Acted in Bad Faith in Refusing to Grieve Marine's Termination

Marine also argues that the Union acted in bad faith in refusing to grieve his termination. To determine whether a union's actions are in bad faith, a subjective inquiry is called for and requires proof that the union failed to act due to an improper motive. *Neal*, 349 F.3d at 370. To establish bad faith, "the union member must adduce 'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Rupe*, 679 F.2d at 691 (quoting *Hoffman v. Lonza*, 658 F.2d 519, 522 (7th Cir. 1981)).

Marine argues the Union acted in bad faith in refusing to grieve his termination when: (1) Guth sent Marine a grievance form on April 12, 2004 to cover up the fact that he deficiently investigated Marine's purported termination in February 2004; and (2) Guth stated Marine could not obtain vacation pay because Marine did not work the necessary nine hundred hours after his anniversary date in March 2003. The Court addresses each in turn.

First, Marine argues that Guth's inclusion of a grievance form in his April 12, 2004 letter, which notified him of several warning notices from Mohr Co. for failure to appear at work and informing him that if he wished to protect his seniority he must return to work or request a leave of absence, is an effort to cover up the fact that Guth told him no grievance was necessary back in February 2004. However, as discussed above, there is nothing in the record that shows

27

that Guth's conduct regarding the February 2004 complaints was intentional, let alone fraudulent, deceitful, or dishonest.

Next, Marine argues that Guth's statement that Marine could not obtain vacation pay because Marine did not work the necessary nine hundred hours after his anniversary date in March 2003 is evidence of the Union's bad faith. In support of this argument, Marine provides a statement of fact asserting: (1) he worked over 1300 hours of straight time from his anniversary date of March 28, 2003 through December 2003; and (2) accordingly to Celeste Mohr, secretary for Mohr Co., there was "no question" that Marine worked more than 900 hours between March 28, 2003 and his last day of work in January 2004. (Pl.'s LR 56.1(b)(3)(B) ¶ 158.) However, neither fact statement is supported by the cited portions of the record.

As to the first statement, Marine submits pages and pages of photocopied time sheets without any authentication. Rule 803(6) requires a "custodian or other qualified witness" to testify that the requirements for the business records exceptions have been met. FED. R. EVID. 803(6). Thus, this evidence is inadmissible because of Marine's failure to lay a proper foundation to meet the business record exception to hearsay. As to the second statement, upon inspection of Celeste Mohr's deposition testimony, she did not state that there was "no question" that Marine worked more than 900 hours between March 28, 2003 and his last day of work in January 2004. (*See* Pl.'s Ex. E, C. Mohr's Dep. at 22.) Her answer was unresponsive. Thus, this statement is unsupported by the cited portion of the record. Without any support for Marine's assertion that Guth's calculation of Marine's hours worked between March 28, 2003 and his last day of work in January 2004 was incorrect, Marine has failed to create a genuine issue as to whether Guth's calculation was fraudulent, deceitful, or dishonest. Thus, his claim that the Union breached its duty of fair representation cannot proceed to trial.

28

## CONCLUSION

For the foregoing reasons the Court grants Mohr Co. and the Union's motions for summary judgment [doc. nos. 11-1, 13-1].

**SO ORDERED**

**ENTERED:** 9/19/05

**HON. RONALD A. GUZMAN**
**United States Judge**